43 P.3d 244

**McCABE HAMILTON & RENNY COMPANY, LTD., a Hawai'i corporation, Kyle Soares, an individual, and John A. Dias, an individual, Petitioners–Appellees,**

v.

**Dean Kawailani CHUNG, Respondent–Appellant;**

**International Longshore and Warehouse Union, Local 142, AFL–CIO, Applicant Intervenor–Appellee.**

**McCabe Hamilton & Renny Company, Ltd., a Hawai'i corporation, Kyle Soares, an individual, John A. Dias, an individual, and Earl Kini Kalaiwa'a, an individual, Plaintiffs–Appellees,**

v.

**Dean Kawailani Chung, Defendant–Appellant;**

**International Longshore and Warehouse Union, Local 142, AFL–CIO, Intervening Party–In–Interest–Appellee.**

Nos. 23176, 23398.

Intermediate Court of Appeals of Hawai'i.

March 4, 2002.

As Amended March 5 and April 22, 2002.

Dane L. Miller, Wilma Sur (Miller, Toku-yama, Kralik & Sur LLP), Honolulu, on the briefs, for defendant-appellant.

Andrew L. Pepper, Christopher S. Yeh (Marr, Hipp, Jones & Pepper), Honolulu, on the briefs, for petitioners-appellees.

BURNS, C.J., WATANABE, and LIM, JJ.

Opinion of the Court by LIM, JJ.

These two consolidated appeals (Nos. 23176 & 23398) center around two temporary restraining orders (TROs or, singular, TRO), both initially sought *ex parte*, entered by the circuit court of the first circuit in favor of Petitioners/Plaintiffs–Appellees McCabe Hamilton & Renny Company, Ltd. (McCabe) and three of its employees, Kyle Soares (Soares), John A. Dias (Dias) and Earl Kini Kalaiwa'a (Kalaiwa'a), and against another of McCabe's employees, Respondent/Defen-dant–Appellant Dean Kawailani Chung (Chung). The first of the TROs was issued in a special proceeding, S.P. No. 00–01–0010, brought by Petitioners McCabe, Soares and Dias (collectively, the Petitioners). The second and subsequent TRO was entered in a following, essentially superseding, civil proceeding, Civil No. 00–01–0863, brought by Plaintiffs McCabe, Soares, Dias and Kalai-wa'a (collectively, the Plaintiffs).

In each proceeding, Chung's union, Appli-cant Intervenor International Longshore and Warehouse Union, Local 142, AFL–CIO (the Union), filed a motion for leave to intervene and a motion to dissolve the TRO entered in the proceeding. In each proceeding, the court denied the Union's motion to intervene, and that denial mooted the Union's motion to dissolve the TRO.

The litigation below came to an end when the court, after an evidentiary hearing, de-nied Plaintiffs' motion for a preliminary in-junction in the civil proceeding. The second TRO expired by its own terms two days after the evidentiary hearing (the first TRO had expired along with the special proceeding). Plaintiffs then filed a notice of dismissal of the civil proceeding without prejudice.

Essentially, Chung raises the following is-sues on appeal:

(1) Whether the court erred in the spe-cial proceeding when it entered the TRO, and when it denied the Union's motions, both of which Chung joined, to intervene and to dissolve the TRO?

(2) Whether the court erred in the civil proceeding when it entered the TRO, and when it denied the Union's motions, both of which Chung joined, to intervene and to dissolve the TRO?

In addition, Chung contests McCabe's con-tention that his appeals are moot. For the reasons set forth below, we conclude that both of Chung's appeals are moot. We therefore decline to address the merits of the issues on appeal as we lack the jurisdiction to do so.

## I. BACKGROUND.

McCabe, a primary provider of transocean-ic shipping into and within the State of Ha-wai'i, employed Union member Chung as a stevedore. McCabe also employed Union members Soares and Dias. Chung served as the Union's shop steward for employees in the McCabe bargaining unit. As such, his duties were "interpeting the collective bar-gaining agreement and work rules, which cover the terms and conditions of employ-ment at McCabe, seeking to resolve on site grievances covering terms and conditions of employment, and if not resolved, filing griev-ances and pursuing those grievances through step meetings."

The events leading up to the issuance of the TROs against Chung began on January 2, 2000. On that night, Kalaiwa'a, a non-Union McCabe dispatcher, made an assignment of work (filling vacancies) that Chung believed was in violation of the assignment procedures agreed to by McCabe and the Union. Chung did not take any action at that time.

Two days later, on January 4, 2000, Chung arrived at work to find that the same dispatcher, Kalaiwa'a, had made another work assignment that Chung believed was in violation of the proper assignment procedures for filling vacancies. Specifically, Kalaiwa'a had filled two vacancies on the 6:00 p.m. shift with two wharf gang members, Soares and Brian Gibson, from the 7:00 p.m. shift. Chung thought the assignments should have been given, instead, to two ship gang members on the 7:00 p.m. shift, one of whom happened to be Chung.

Chung said that he first attempted to resolve the dispute with Kalaiwa'a through "on-the-job-arbitration." [1] Kalaiwa'a charged that Chung threatened him during the discussion: "He verbally mentioned that—he said pertaining to assignments and basically he said, You wait, you fucka, you wait, you fucka." Kalaiwa'a claimed that, as a result, he felt fear for his personal safety and went into hiding on an outer island for several days. Chung denied Kalaiwa'a's version of the events. Dias swore, however, that he saw Chung confront Kalaiwa'a and tell him, "I going break your ass."

Unable to resolve the assignment dispute, Chung called Elgin Calles, a McCabe machine operator and Union higher-up. Chung explained the problem to Calles, who then spoke with Kalaiwa'a and some other McCabe employees to discuss the assignment rules and the night's controversy. Later that evening, Calles received a call from Bob Bee (Bee), the vice-president of operations at McCabe, concerning the dispute. Calles told Bee that he thought Kalaiwa'a had violated the work rule concerning vacancy assignments, and that the violation had created hostility between the wharf gang and ship gang employees. According to Calles, if Kalaiwa'a had filled the vacancies based on the Union's interpretation of the assignment rules, the two vacancies should have been assigned to Chung and Tony Baldomero.

The next day, Calles met with Bee to further discuss the dispute. They decided that Kalaiwa'a had erroneously assigned the work vacancies to the wharf gang employees. Calles felt the dispute was thus resolved, and told Bee that he planned to hold a Union meeting that evening to discuss the resolution of the issue with affected Union employees. When Chung reported to work that evening, Calles informed Chung that he would be reimbursed for the pay he would have received had he been properly assigned the night before.

Shortly thereafter, just before the start of the 6:00 p.m. shift, Calles held the meeting in the employee break room. Approximately thirty wharf gang and ship gang employees attended. Chung stood in the back of the room. During the meeting, Calles explained the Union's interpretation of the assignment agreement and colorful discussion ensued. Although it is disputed what actually happened at the meeting, it is clear that the discussion became heated. It apparently deteriorated into "a shouting match."

Calles and Soares started arguing over the disputed assignment procedures and other issues dividing the Union members. Soares at one point complained that he had never had a chance to vote on the rules at issue. Chung then suggested a vote to resolve the dispute, since both the wharf gang and the ship gang were present. Soares retaliated with a personal attack on Chung. Calles recalled that, "[Soares] told Chung, 'fuck you. You're nothing but one fucking punk.' He also told Chung in a loud voice for all to hear that Chung was a faggot, a queer, had no friends at the wharf, Chung was just two years old stealing cookies when he (Soares) was working the piers." Soares and Chung continued to make disparaging remarks towards one another as the meeting slouched

---

1. An "on-the-job-arbitration" is a mechanism in which a McCabe representative and a Union representative meet in an attempt to resolve disputed applications of work rules, before resorting to formal grievance procedures.

to its conclusion. Soares and Dias swore that at some point, Chung confronted Soares and stated, "I going broke your ass. You wait, I going broke your ass." After Dias also criticized Chung, Chung allegedly told him, "I going broke your ass, too." Chung then proceeded to tell Soares and Dias, "Just wait. I going broke both your asses. I going get you." Chung admitted to asking, "[Soares], why are you doing this? You know I would broke your ass." Chung swore that as they were leaving the meeting, Soares put his arm around Chung's neck, squeezed Chung's trapezius and said, "you wait you fucker, this ain't over, you going get it."

Outside of the meeting room, Soares asked Bee to call the police (Calles and Chung swore that Soares yelled at Bee), claiming a fear that Chung would attack him. For his part, Chung alleged that he approached Bee and asked to make a formal complaint that Soares had threatened and assaulted him, but Bee merely "put his hand in front of his face and then walked away."

The police arrived on the scene. Harbor police also arrived. The harbor police took statements from witnesses, but no arrests were made. Soares said that he filed a complaint against Chung for terroristic threatening.

One day later, on January 7, 2000, Petitioners filed an *ex parte* motion for a temporary restraining order against Chung, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 65 (2000),[2] thereby initiating

---

2. Hawai'i Rules of Civil Procedure (HRCP) Rule 65 (2000) provides:

(a) **Preliminary Injunction.**

(1) *Notice.* No preliminary injunction shall be issued without notice to the adverse party.

(2) *Consolidation of Hearing With Trial on Merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

(b) **Temporary Restraining Order; Notice; Hearing; Duration.** A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained a temporary restraining order shall proceed with the application for a preliminary injunction and, if that party does not do so, the court shall dissolve the temporary restraining order. On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

(c) **Security.** In all cases, the court, on granting a temporary restraining order or a preliminary injunction or at any time thereafter, may require security or impose such other equitable terms as it deems proper. No such security shall be required of the State or a county, or an officer or agency of the State or a county.

The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under this rule.

(d) **Form and Scope of Injunction or Restraining Order.** Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, ser-

the special proceeding. No complaint accompanied the motion. The motion was "an attempt to restrain a person who has engaged in overt threats of violence in the workplace and is believed to have violent ideation[.]" In their *ex parte* motion, Petitioners explained that, "because it is Petitioners' belief that notice to [Chung] could trigger the very violence sought to be restrained, Petitioners have not notified [Chung] of this motion." Petitioners requested that the court temporarily restrain Chung from, among other things, committing violence against persons or property on McCabe's premises; committing violence against McCabe personnel and related persons and entities; trespassing onto McCabe's premises; and approaching within one hundred feet of each of fifteen Oahu piers, three neighbor island harbors and eight named McCabe personnel (including Soares, Dias and Bee) and their residences. In their memorandum in support of the motion, Petitioners described Chung as "a very unstable, volatile, and explosive person[,]" and alleged prior instances of Chung's violent behavior. The incident actuating the motion was the confrontation between Soares and Chung at the January 5, 2000 meeting. The court granted the motion on the day of its filing. The court thereupon issued the requested TRO, which was to remain in effect until January 17, 2000. The TRO stated that "Petitioners shall attempt to effectuate service of a copy of this [TRO] on [Chung] as soon as reasonably possible."

On January 13, 2000, Petitioners filed an *ex parte* motion for extension of the January 7, 2000 TRO, pursuant to HRCP Rule 65(b)(2). In that motion, Petitioners signaled their intention to file a motion for a preliminary and/or permanent injunction, and asked that the TRO be extended until the forthcoming motion could be heard. The court granted the motion, and extended the TRO until January 27, 2000. On January 14, 2000, Petitioners filed their motion for a preliminary and/or permanent injunction, pursuant to HRCP Rule 65(b). This motion was "based on the same reasons" Petitioners cited in seeking the TRO.

On January 20, 2000, the Union filed a motion to intervene as a party respondent in the special proceeding. The Union sought "to enforce Chapter 380 of the [Hawaii Revised Statutes (HRS) (1993) ] to challenge the State court's jurisdiction to issue a[TRO] arising out of a labor dispute[,] and if the Court has jurisdiction[,] require the court to comply with the notice, hearing and findings requirements under that statute[,]" and thereupon contended it had an interest in the special proceeding that conferred upon it the right to intervene.

Our legislature modeled HRS chapter 380 (Hawai'i's Norris–LaGuardia Act, sometimes referred to as our Little Norris–LaGuardia Act) on the federal Norris–LaGuardia Act, 29 U.S.C.A. § 101 *et seq.* (1998). *See* Sen. Stand. Comm. Rep. No. 508, in 1963 Senate Journal, at 849 ("The provisions of the bill parallel those of the Norris–LaGuardia Act of 1932 which is applicable to federal courts."). Generally, Hawai'i's Norris–LaGuardia Act limits the jurisdiction of the State courts to grant injunctive relief in a "labor dispute" [3] absent compliance with pro-

vants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

(e) **Civil Defense and Emergency Act Cases.** This rule shall not modify section 128–29 of the Hawai'i Revised Statutes.

3. Hawaii Revised Statutes (HRS) § 380–13 (1993) provides:

When used in this chapter, and for the purposes of this chapter:

(1) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether the dispute is (A) between one or more employers or associations of employers and one or more employees or associations of employees; (B) between one or more employers or associations of employers and one or more employers or associations of employers; or (C) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

(2) A person or association shall be held to be a person participating or interested in a

cedural safeguards, including, *inter alia,* requirements with respect to notice, hearing and findings of fact by the court.[4] *See generally* HRS § 380–1 (1993);[5] *see, e.g.,* HRS § 380–7 (1993).[6]

labor dispute if relief is sought against the person or it, and if the person or it is engaged in the same industry, trade, craft, or occupation in which the dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

(3) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

4. It is important to recognize that HRS chapter 380 (1993) does not completely prohibit courts from issuing injunctive relief in a "labor dispute." Although certain categories of injunctive relief not relevant here cannot be granted in a "labor dispute," HRS § 380–4 (1993), other types of injunctive relief may be granted if the court follows certain statutory procedures and guidelines. *See, e.g.,* HRS § 380–7 (1993). The Supreme Court of Louisiana recognized, in discussing its own Little Norris–LaGuardia Act, which was also patterned after the federal Norris–LaGuardia Act, that, "Injunctions are not prohibited in labor disputes, but preclusive procedures and guidelines must be followed before that relief is available." *Baton Rouge Coca–Cola Bottling Co., Ltd. v. General Truck Drivers, Warehousemen and Helpers, Local Union No. 5,* 403 So.2d 632, 635 (La.1981).

5. HRS § 380–1 (1993) provides that:

No court of the State shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared herein.

6. HRS § 380–7 provides:

No court of the State shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect:

(1) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

(2) That substantial and irreparable injury to complainant's property will follow;

(3) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

(4) That complainant has no adequate remedy at law; and

(5) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

The hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed charged with the duty to protect complainant's property; provided that if a complainant also alleges that, unless a temporary restraining order is issued without notice, a substantial and irreparable injury to complainant's property will be unavoidable, a temporary restraining order may be issued upon testimony under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice. A temporary restraining order shall be effective for no longer than five days and shall become void at the expiration of the five days. No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of the order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

The undertaking mentioned in this section shall be understood to signify an agreement entered into by the complainant and the surety upon which a decree may be rendered in the same suit or proceeding against the complainant and surety, upon a hearing to assess damages of which hearing complainant and surety shall have reasonable notice, the complainant and surety submitting themselves to the juris-

**114**

In its memorandum in support of the motion for intervention, the Union argued that it satisfied the four requirements for intervention as of right inherent in HRCP Rule 24(a) (2000): [7] (1) its motion was timely, (2) it had an interest relating to the property or transaction which was the subject of the proceedings, (3) its interest may be impaired without intervention, and (4) its interest may not be adequately represented by the only existing respondent in the action, Chung. *See Kim v. H.V. Corporation*, 5 Haw.App. 298, 301, 688 P.2d 1158, 1161 (1984). Alternatively, the Union contended the court should allow permissive intervention under HRCP Rule 24(b) (2000).[8]

Also on January 20, 2000, the Union filed a motion to dissolve the TRO and to dismiss the petition for lack of jurisdiction. In its memorandum in support of the motion, the Union argued that, inasmuch as the underlying dispute was a "labor dispute" under Hawai'i's Norris–LaGuardia Act, the court lacked jurisdiction to grant injunctive relief; that, alternatively, the court did not comply with the Act's procedural safeguards in issuing the TRO; and that, in any event, Petitioners did not satisfy all general elements required for injunctive relief.

On January 24, 2000, Chung joined in both of the Union's January 20, 2000 motions.

Petitioners also filed a motion on January 20, 2000. It was an *ex parte* motion for further extension of the TRO, from January 27, 2000 to the February 7, 2000 hearing that had been set for Petitioners' motion for a preliminary and/or permanent injunction. On January 21, 2000, the court denied the *ex parte* motion without prejudice, and set it for

hearing, along with the Union's two January 20, 2000 motions, on January 26, 2000. Accordingly, Petitioners filed and served a notice of the hearing on their motion to further extend the TRO.

At the January 26, 2000 hearing, the court orally found and concluded as follows:

> The incident or transaction which triggered the ex parte temporary restraining order in this case was an incident which occurred on January 5 of the year 2000. In pertinent part, the incident involved a workplace confrontation between [Chung] and at least two of his co-workers. It is undeniable that the incident occurred at the place of employment of all the involved individuals and that the confrontation, apparently, arose out of a discussion regarding the terms and conditions of work.
>
> Based on the limited record presented, the Court finds that the alleged January 5th, 2000, incident, which is the basis for the issuance of the ex parte temporary restraining order in this case, does not constitute a labor dispute as the term is defined by [HRS § 380–13(3) ]. The January 5, 2000, incident is a verbal and physical confrontation between individual workers.
>
> Based on the foregoing, the Court finds that the interest claimed by the Union is not one which is significantly protectable as required by the law.
>
> On that basis, the Court, therefore, denies the Union's motion to intervene.

Accordingly, the court also orally denied the Union's motion to dissolve the TRO and dismiss the petition. As a result, the court

---

diction of the court for that purpose. But nothing in this section shall deprive any party having a claim or cause of action under or upon such undertaking from electing to pursue the party's ordinary remedy by suit at law or in equity.

**7.** HRCP Rule 24(a) (2000) provides:

Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may' as a practical matter impair or

impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**8.** HRCP Rule 24(b) (2000) provides, in relevant part, that:

Upon timely application anyone may be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

orally granted Petitioners' motion to further extend the TRO until the February 7, 2000 hearing on their motion for a preliminary and/or permanent injunction.

On January 27, 2000, the court issued its written order granting Petitioners' motion for further extension of the TRO. The order noted that, "Due to the Court's calendar, February 7, 2000 is the soonest the Court can accommodate Petitioners' request for an expedited hearing of Petitioners' Motion for Issuance of Preliminary and/or Permanent injunction. If the Court could accommodate Petitioners' request sooner, it would do so. Out of an abundance of caution, and based on the Court's authority pursuant to [HRCP Rule 65], the Court grants Petitioners' Motion and will issue an Extended [TRO.]" The extended TRO was filed the same day.

On February 4, 2000, the parties filed a stipulation to continue the February 7, 2000 hearing on Petitioners' motion for a preliminary and/or permanent injunction to March 1, 2000. Apparently, the continuance was at Chung's request, and Petitioners acceded only on condition that the TRO be extended yet again. Accordingly, a stipulated extended TRO was filed on February 3, 2000, to remain in effect "until March 1, 2000 at 1:30 p.m. (or until such other time as the Court may hear and adjudicate Petitioners' Motion for Issuance of Preliminary and/or Permanent Injunction) or until further order of the Court."

The court filed its order denying the Union's motion to intervene on February 8, 2000. The order stated that the imbroglio involving Chung and the Petitioners "did not constitute a 'labor dispute' as that term is defined by and used in [HRS § 380–13(3) ]." The court thereupon concluded that "[the Union] does not have a significantly protectable interest in workplace violence, as would be required for intervention under [HRS chapter 380]." On February 14, 2000, the Union filed a notice of appeal (No. 23165) of the order denying its motion to intervene.

On February 16, 2000, Chung filed a notice of appeal (No. 23176) of the same order. Chung also appealed the January 27, 2000 order granting Petitioners' motion for further extension of the TRO.

On February 22, 2000, Chung filed a motion to dissolve the TRO, "on the grounds that 1) [Chung's] Notice of Appeal has divested this Court of jurisdiction to render any further injunction; and 2) [Chung] has been terminated from his employment with [McCabe] rendering the TRO moot." In the alternative, Chung sought a continuance of the hearing on Petitioners' motion for a preliminary and/or permanent injunction to afford his new counsel time to prepare. Also on February 22, 2000, Chung filed a motion to dismiss, on the ground that the special proceeding was fundamentally flawed due to the lack of an underlying complaint.

The court[9] held a hearing on Chung's February 22, 2000 motions (along with various other motions filed by the parties) on February 24, 2000. The March 15, 2000 order issuing out of the hearing granted Chung's motion to dismiss, thus rendering his motion to dissolve the TRO moot. The order is silent as to why Chung's motion to dismiss was granted, and none of the parties to these appeals saw fit to include a transcript of the February 24, 2000 hearing in the record on appeal. It appears, however, that the court granted Chung's motion to dismiss on account of the lack of a complaint underlying the special proceeding, because the court delayed entry of its written order until "the filing of a complaint against [Chung] ...; and ... the filing of an *ex parte* motion for [TRO] against [Chung][.]" In addition, the court extended the February 3, 2000 stipulated extended TRO until entry of its written order.[10]

On March 14, 2000, Plaintiffs filed a verified complaint against Chung, thus commencing the civil proceeding. In their complaint, Plaintiffs prayed for a TRO essentially iden-

---

9. On February 18, 2000, Judge Gary W.B. Chang was assigned to the case, replacing Judge Kevin S.C. Chang.

10. The court had previously, on March 3, 2000, issued another bridging TRO, which was to re-

main in effect "until the earliest of (1) March 15, 2000 ..., or (2) the filing of a written order dismissing this case, or (3) further order of the Court."

tical to the TRO imposed in the special proceeding, and for preliminary and permanent injunctive relief. The next day, Plaintiffs followed their complaint with an *ex parte* motion for the TRO, which the court immediately granted. The resulting TRO was to remain in effect until March 25, 2000. On March 16, 2000, Plaintiffs filed a motion for a preliminary injunction.

On March 21, 2000, the Union filed both a motion to intervene in the civil proceeding and a motion to dissolve the TRO and to dismiss the motion for a preliminary injunction. Its arguments in support of the motions were similar to those underlying its cognate motions in the special proceeding. As in the special proceeding, Chung filed a joinder in the Union's two motions. At the March 23, 2000 hearing on the Union's two motions, the court orally held that

> [t]his Court views this matter as dealing with averting potential workplace violence, and that's the extent of this Court's interest in this matter. This Court will not be entertaining arguments or evidence regarding labor disputes, infringing on the right of [the Union] to have a shop steward present. Those matters are not before this Court.
>
> . . . .
>
> And therefore, . . . the Court will deny the motion to intervene and also deny the motion to dissolve the TRO.

Later that day, the court held an evidentiary hearing on Plaintiffs' motion for a preliminary injunction. The court filed its findings of fact and conclusions of law, and the order denying Plaintiffs' motion for a preliminary injunction, on March 29, 2000. The court concluded therein that Plaintiffs did not prove they were entitled to a preliminary injunction against Chung. In support of that conclusion, the court found, in pertinent part, that:

2. There is conflicting testimony as to the events that occurred at the January 5, 2000 shop-gate meeting.

3. Dock workers are a rough group and their daily language may not be the same as that of the general population.

4. There is conflicting evidence as to other allegations of assault by [Chung].

. . . .

6. [Chung] testified that he has no intent to harm any co-worker on the wharfs or management of [McCabe] and the Court gives [Chung] the benefit of the doubt with regard to this testimony.

On the same day the court's findings, conclusions and order were filed, McCabe filed a notice of dismissal of the civil proceeding, without prejudice.

On April 3, 2000, the court filed the order denying the Union's motion to intervene and its motion to dissolve the TRO and to dismiss the motion for a preliminary injunction. The Union filed a notice of appeal of the order denying the two motions on April 17, 2000 and an amended notice of appeal on April 18, 2000 (No. 23375). Chung filed a notice of appeal of the same order on April 27, 2000 (No. 23398).

On February 5, 2002, after completion of briefing in all four appeals originally noticed in this case, the Union filed motions to dismiss both of its appeals (Nos. 23165 & 23375), pursuant to a settlement agreement with McCabe. On February 14, 2002, we entered an order granting the Union's motions. We are left, then, with Chung's two appeals (Nos. 23176 & 23398), which we consolidated, *sua sponte*, by order filed on February 14, 2002.

## II. DISCUSSION.

■ "This court may not decide moot questions or abstract propositions of law." *Life of the Land v. Burns*, 59 Haw. 244, 250, 580 P.2d 405, 409 (1978) (citation, internal quotation marks and brackets omitted). *See also Wong v. Board of Regents, Univ. of Hawaii*, 62 Haw. 391, 395, 616 P.2d 201, 204 (1980) ("Courts will not consume time deciding abstract propositions of law or moot cases, and have no jurisdiction to do so." (Citation omitted.)). The application of the mootness doctrine is well established:

> It is well-settled that the mootness doctrine encompasses the circumstances that destroy the justiciability of a case previously suitable for determination. A case is

moot where the question to be determined is abstract and does not rest on existing facts or rights. Thus, the mootness doctrine is properly invoked where "events ... have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised."

*In re Thomas,* 73 Haw. 223, 225–26, 832 P.2d 253, 254 (1992) (ellipsis in the original) (citing *Wong,* 62 Haw. at 394, 616 P.2d at 203–4). The policy underlying the mootness doctrine is also well recognized:

This court will not proceed to a determination when its judgment would be wholly ineffectual for want of a subject matter on which it could operate. An affirmance would ostensibly require something to be done which had already taken place. A reversal would ostensibly avoid an event which had already passed beyond recall. One would be as vain as the other. To adjudicate a cause which no longer exists is a proceeding which this court uniformly has declined to entertain.

*Brownlow v. Schwartz,* 261 U.S. 216, 217–18, 43 S.Ct. 263, 67 L.Ed. 620 (1923) (citations omitted). *See also Wong,* 62 Haw. at 394–95, 616 P.2d at 204 ("The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (Citations omitted.)).

 It is apparent that Chung's appeals are precisely the type that we should "uniformly ... decline[ ] to entertain." *Brownlow,* 261 U.S. at 218, 43 S.Ct. 263. The essential subject matter of these appeals, the TROs, have long since expired. The court, in the end, denied McCabe's request for an injunction against Chung. Adjudicating the issues in this case would indeed be "ineffectual" and "vain[,]" *id.* at 217, 43 S.Ct. 263, because "the question to be determined is abstract and does not rest on existing facts or rights." *Thomas,* 73 Haw. at 226, 832 P.2d at 254.

Chung's first appeal (No. 23176) is from the court's orders in the special proceeding denying the Union's motion to intervene and further extending the TRO. Chung's second appeal (No. 23398) is from the court's orders in the civil proceeding denying the Union's motion to intervene and its motion to dissolve the TRO. Were we to conclude on the merits that the Union should have been granted leave to intervene, we would be in the surreal position of granting the Union leave to intervene in proceedings that no longer exist. *Cf. United States v. Ford,* 650 F.2d 1141, 1143 (9th Cir.1981) ("Even if we were to conclude that the district court erred in denying appellants' motion to intervene, none of their claims could be adjudicated now that the summons enforcement proceeding has been dismissed. Since there is no proceeding in which appellants can intervene, this appeal is moot."). At any rate, it appears by the Union's settlement with McCabe and consequent dismissal of its appeals that it is no longer interested in intervention. And were we to hold in favor of Chung on the propriety of the TROs, another outlandish oxymoron would result. We would be, in effect, extinguishing long-extinguished TROs. *Cf. Bevan v. Wolfson,* 638 So.2d 527, 527 (Fla.Dist.Ct. App.1994) (appeal challenging orders of the trial court granting petitions for injunction for protection against repeat violence was dismissed as moot since injunctions had expired). This is the moot case described in *Thomas,* in which "events ... have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised." *Thomas,* 73 Haw. at 226, 832 P.2d at 254 (citation and internal quotation marks omitted).

 Chung argues, however, that his appeals are reviewable on the merits because they come within an exception to the mootness doctrine, for cases in which the issues are "capable of repetition, yet evading review." *Thomas,* 73 Haw. at 226, 832 P.2d at 255. As interpreted by our supreme court,

[t]he phrase, "capable of repetition, yet evading review," means that a court will not dismiss a case on the grounds of mootness where a challenged governmental ac-

tion would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit.

*Id.* (quoting *Life of the Land,* 59 Haw. at 251, 580 P.2d at 409–10).

Chung would have us apply the exception in this case for the following reasons:

Ultimately, Chung prevailed at the contested preliminary injunction hearing in spite of the Circuit Court applying the wrong standard, in spite of the [Union] being barred from the proceedings and in spite of McCabe's inflammatory rhetoric about violence. The harm to Chung, however, is manifest: the Circuit Court's failure to apply the [Hawai'i Norris–LaGuardia Act] allowed [McCabe] to procure a TRO against Chung, put Chung in significant personal difficulties and succeeded in having the Circuit Court interfere in a "labor dispute[,"] outside the explicit jurisdictional boundaries the [Hawai'i] State Legislature requires.

The Circuit Court's obvious reluctance to apply the [Hawai'i Norris–LaGuardia Act] may encourage employers to seek the Court's assistance against employees in future "labor disputes[."] Indeed, unless the Circuit Courts are instructed by this Court to the contrary, the balance between working people and employers that the Legislature achieved via the [Hawai'i Norris–LaGuardia Act] may be subverted. Because there are no significant cases of this Court dealing with the [Hawai'i Norris–LaGuardia Act], this case is of significant public policy importance.

Chung Opening Brief (No. 23398) at 2–3.

■ First and overarching in our consideration of the exception is, that "the capable-of-repetition doctrine applies only in exceptional situations[.]" *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (original brackets, citation and internal quotation marks omitted).

Further, as cited above, our supreme court has considered the exception in connection with an allegation of improper government action, so evanescent as to evade full review.

*See, e.g., Thomas,* 73 Haw. at 226, 832 P.2d at 255; *Life of the Land,* 59 Haw. at 251, 580 P.2d at 409–10. We have discerned and distinguished the apparent element of government action in Hawai'i cases applying the exception:

Unlike *[Johnston] v. Ing,* [50 Haw. 379, 381, 441 P.2d 138, 140 (1968)], where the form and content of election ballots were involved; *Kona Old Hawaiian Trails Group [v. Lyman,* 69 Haw. 81, 87, 734 P.2d 161, 165 (1987)], where the issuance of a special management area minor permit under the Coastal Zone Management Act, Hawaii Revised Statutes Chapter 205A (1985), was involved; and *Mahiai [v. Suwa,* 69 Haw. 349, 354–55, 742 P.2d 359, 365 (1987)], where a challenge to the [Hawai'i] Board of Agriculture's decision requiring the slaughter of all cattle on [Moloka'i] was involved, this case involves a dispute arising out of a lease between private litigants and does not involve an issue affecting the public interest.

*Exit Co. Ltd. Partnership v. Airlines Capital Corp.,* 7 Haw.App. 363, 366, 766 P.2d 129, 131 (1988) (an appeal from a summary judgment of possession and cancellation of a lease between private businesses was moot because the writ of possession had been executed and the lease had expired). The supreme court has couched its analytical framework for invocation of the exception in terms of government action:

There is a well settled exception to the rule that appellate courts will not consider moot questions. When the question involved affects the public interest, and it is likely in the nature of things that similar questions arising in the future would likewise become moot before a needed authoritative determination by an appellate court can be made, the exception is invoked.

Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question.

*Johnston,* 50 Haw. at 381, 441 P.2d at 140 (citations and internal quotation marks and block quote format omitted).

While we do not hold that government action is a desideratum of the exception, *see, e.g., Lee v. Schmidt–Wenzel,* 766 F.2d 1387, 1390 (9th Cir.1985) (discussing when to apply the exception in litigation between private parties), its constant presence in Hawai'i cases applying the exception underscores the element of "an issue affecting the public interest." *Exit Co.,* 7 Haw.App. at 366, 766 P.2d at 131. Like *Exit Co.,* this case, regardless of whether it is a "labor dispute" under HRS chapter 380, involves a rather quotidian dispute among private parties. Shorn of partisan allegation, this case is about a Union meeting in which some members got into an argument involving threats and a generous helping of profanity. It does not, on its face, "involve an issue affecting the public interest." *Id.*

Nor is the elemental capacity for repetition present here. Chung warns of repeated exploitation of the allegedly improper procedures utilized here by McCabe and countenanced by the court, in future cases by McCabe and other employers generally intent upon restraining legitimate union activity. However, it appears that it is the factual situation underlying the litigation, and not the litigation itself, that is relevant to the exception. This would appear to make some sense. The public interest we spoke of in *Exit Co.* is piqued by the reasonable expectation of recurrent transgressions. It is not intrigued by trial court error in dealing with a transgression not likely to recur. And were the rule otherwise, the preemptive effect intended by exceptional appellate review would be serendipitous, at best. Our supreme court has intimated this rule. In *Thomas,* the supreme court determined that the exception did not apply because "[t]he instant quo warranto action arose out of a unique factual situation" and "[t]here is no reasonable expectation that the alleged violation will recur[.]" *Thomas,* 73 Haw. at 227, 832 P.2d at 255 (citations, internal quotation marks and ellipsis omitted). Any contention that the precise factual situation underlying this dispute is likely to recur is "too conjec-

tural for appellate review[,]" *id.* at 228, 832 P.2d at 255, and Chung does not so aver.

Even assuming, *arguendo,* that the capacity for repetition pertinent to the exception refers to improper litigation procedures, there is nothing in the record that demonstrates a "reasonable expectation that the alleged violation will recur." *Id.* at 227, 832 P.2d at 255 (citations, internal quotation marks and ellipsis omitted). Chung complains on appeal that "it is too easy for employers to procure restraining orders against unsophisticated employees, since the Circuit Courts, now not having any Supreme Court guidance in the area, apparently routinely approve them." Chung Jurisdictional Statement (No. 23176) at 8. In support of this charge, Chung cites a McCabe filing in the special proceeding that had attached to it copies of TROs entered in other cases, obtained in the circuit courts by various corporations (not including McCabe) against various individuals without accompanying complaint and apparently on an *ex parte* basis. But other than that, none of the examples reveals the underlying factual and procedural circumstances. Indeed, there is no indication that any of the examples involved an employment relationship, such that a "labor dispute" could be alleged. The only constant tying those examples to our case is McCabe's counsel, representing the petitioners in those examples. There is also mention in the record on appeal that "a gentleman named Keith Vierra ... once engaged in some workplace threats at McCabe[,]" and that, a "stipulated permanent injunction [was] obtained against Mr. Vierra following his workplace violence threats[.]" There is, however, nothing beyond the foregoing in the record to engender a reasonable expectation that the alleged procedural violations will recur. *See Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) ("The Court has never held that a mere physical or theoretical possibility was sufficient to [invoke the exception].") Without adequate support in the record, labor suspicions about management motives are mere speculation. *Cf. Ford,* 650 F.2d at 1142–43 (appeal was rendered moot by IRS's voluntary dismissal of underlying summons enforcement petition

amidst allegations that the petition was brought in bad faith, even though appellants argued that they "cannot be deprived of a determination of the merits simply because the [IRS] want[s] to take a 'walk' from the case and hide [its] misconduct" (citation and internal quotation marks omitted)).

Hence, we do not discern, on this record, that the factual situation here is "capable of repetition," such that the "capable of repetition, yet evading review" exception to the mootness doctrine is applicable. *Thomas,* 73 Haw. at 226, 832 P.2d at 255. Nor can we say, were these circumstances to recur, that they would necessarily evade review. Assuming, for the nonce, that Chung is correct in characterizing our case as a "labor dispute" under Hawai'i's Norris–LaGuardia Act, then in the event an injunction is imposed in the recurrent case, the Act expressly provides for appellate review. HRS § 380–10 (1993).[11] Indeed, in HRS § 380–10, the Act provides for expedited appellate review.

Chung complains, however, that the recurrent case will always evade review in at least one respect: "Since TRO's by their very nature expire, the issuance of a TRO such as the one issued against Chung will inevitably evade review. Thus, the lower court's TRO falls squarely within the exception to the mootness doctrine: it presents a question of great public import which, by its nature, evades authoritative review." Chung Jurisdictional Statement (No. 23398) at 6.

 We agree that TROs, because of their fundamentally fleeting nature, will in most instances evade review. That is the nature of the beast. But we do not agree that this predicate actuates the exception.

The very evanescent nature of a TRO that evades review ensures that the burdens imposed will be similarly lambent. And, as we have pointed out, a "labor dispute" TRO that matures into a preliminary injunction is subject, by statute, to expedited appellate review. Even our legislature, which enacted HRS chapter 380 out of a profound concern for protecting the right of individual workers to organize, *see* HRS § 380–2 (1993), provided for an expedited appeal only from "any temporary *injunction* in a case involving or growing out of a labor dispute," HRS § 380–10 (emphasis supplied), despite being expressly cognizant of the difference between a TRO, a preliminary injunction and a permanent injunction. *See, e.g.,* HRS § 380–4 (1993) (prohibiting the issuance, in a "labor dispute," of certain categories of "restraining order or temporary or permanent injunction"); HRS § 380–9 (1993) (requiring specificity in, and findings of fact in support of, any "restraining order or temporary or permanent injunction" issued in a "labor dispute").

In sum, we believe, and so conclude, that this is not the "exceptional situation[ ]," *Spencer,* 523 U.S. at 17, 118 S.Ct. 978, "affecting the public interest[,]" *Exit Co.* 7 Haw. App. at 366, 766 P.2d at 131, that is "capable of repetition, yet evading review." *Thomas,* 73 Haw. at 226, 832 P.2d at 255. These appeals are moot, and we will not review them.

 Chung also argues that his appeals are not moot because be asserts an entitlement to damages under HRS § 380–7,[12] thus preserving an adversity of interest

---

11. HRS § 380–10 (1993) provides:
 Whenever any court of the State issues or denies any temporary injunction in a case involving or growing out of a labor dispute, an appeal shall lie as of right to the supreme court subject to chapter 602, notwithstanding any provision of section 641–1. The appeal shall be heard and the temporary injunctive order affirmed, modified, or set aside with the greatest possible expedition, giving the proceedings precedence over all other matters of the same character.

12. HRS § 380–7 provides, in pertinent part, that:
 No temporary restraining order or temporary injunction shall be issued except on condition

that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of the order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.
 The undertaking mentioned in this section shall be understood to signify an agreement entered into by the complainant and the surety upon which a decree may be rendered in the same suit or proceeding against the complain-

and potential for effective relief that prevents this case from going moot. The answer to this contention is quite simple. Chung never asked for damages. Nowhere in the record is there any indication that Chung asserted a claim of any kind or under any authority for damages, attorney's fees or costs. Nor is there in the record any indication that Chung offered evidence of specific loss or damage. The record shows that Chung was well aware of the injunction bond requirement contained in HRS § 380-7 but did not ask for such security for damages he might incur, even though McCabe indicated to the court its willingness to post it. A claim first conjured on appeal cannot raise up and revivify a moot controversy, and we will not countenance such an undertaking. *Cf. United States v. International Union, United Mine Workers of America*, 190 F.2d 865, 874–79 (D.C.Cir. 1951) (government's appeal of the dismissal of its civil contempt petition calculated to coerce mine workers union to obey TRO against work stoppages was moot due to interim execution of a new agreement between union and management, and government's assertion on appeal of a claim for compensatory damages by reason of union's disobedience could not save its appeal from mootness where the government did not plead or offer to prove damages below; in addition, the possibility of an award of "costs" to the appellant in the event of a reversal cannot stave off mootness).

■ When all is said and done, what seems to most exercise Chung in this case is his belief that the court erred badly and erred often, and in doing so played right into McCabe's anti-labor machinations. Hence, Chung's insistence that the entire balance of labor relations will turn topsy-turvy, "unless the Circuit Courts are instructed by this Court to the contrary[.]" The short answer to this concern is that we are not in the business of "instructing" the trial courts, except insofar as it is incidental to deciding "actual controversies by a judgment which can be carried into effect," *Wong*, 62 Haw. at

394, 616 P.2d at 204; in other words, deciding cases that are not moot:

> The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it.

*United States v. Hamburg–Amerikanische*, 239 U.S. 466, 475–76, 36 S.Ct. 212, 60 L.Ed. 387 (1916).

### III. DISPOSITION.

We recognize that, because the appeals are moot, we do not have occasion to address the merits of the various issues raised by Chung in his appeals. We further acknowledge that "the imposition of issue preclusion where appellate review has been frustrated due to mootness is obviously unfair." *Aircall of Hawaii, Inc., v. Home Properties, Inc.*, 6 Haw.App. 593, 595, 733 P.2d 1231, 1232 (1987). In such cases, we have held that "in order to avoid such a result, the solution lies in the adoption of the federal practice of having the appellate court vacate the judgment of the trial court and direct dismissal of the case." *Exit Co.*, 7 Haw.App. at 367, 766 P.2d at 131 (citation, brackets and internal quotation marks omitted).

Accordingly, we vacate the orders of the court below, save for its dismissal of the special proceeding and the civil proceeding. This will prevent the orders, which are " 'unreviewable because of mootness, from spawning any legal consequences.' " *Aircall*, 6

ant and surety, upon a hearing to assess damages of which hearing complainant and surety shall have reasonable notice, the complainant and surety submitting themselves to the jurisdiction of the court for that purpose. But

nothing in this section shall deprive any party having a claim or cause of action under or upon such undertaking from electing to pursue the party's ordinary remedy by suit at law or in equity.

Haw.App. at 596, 733 P.2d at 1233 (quoting *United States v. Munsingwear, Inc.,* 340 U.S. 36, 41, 71 S.Ct. 104, 95 L.Ed. 36 (1950)). As for the possibility of issue preclusion arising out of the dismissal of the special proceeding and the civil proceeding, it appears McCabe is not concerned, as it did not appeal.