145 P.3d 704

### Caren DIAMOND and Harold Bronstein, Plaintiffs–Appellants,

v.

### STATE of Hawai'i, BOARD OF LAND AND NATURAL RESOURCES, and Carl Stephens, Defendants–Appellees.

No. 26997.

Supreme Court of Hawai'i.

Oct. 24, 2006.

As Corrected Oct. 25, 2006.

---

**17.** In light of this court's holding, this court need not address the remainder of Jack's Tours' con-

tentions.

Harold Bronstein, on the briefs, Lihue, for plaintiffs-appellants Caren Diamond and Harold Bronstein.

Sonia Faust and Linda L.W. Chow, Deputy Attorneys General, on the briefs, for defendant-appellee State of Hawai'i, Board of Land and Natural Resources.

A. Bernard Bays and Michael C. Carroll (of Bays, Deaver, Lung, Rose & Baba), on the briefs, Honolulu, for defendant-appellee Carl Stephens.

Isaac H. Moriwake and D. Kapua'ala Sproat, for amici curiae Public Access Shoreline Hawai'i and Sierra Club.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Plaintiffs–Appellants Caren Diamond and Harold Bronstein [hereinafter, collectively,

Plaintiffs] [1] appeal from the Circuit Court of the Fifth Circuit's January 11, 2005 judgment [2] affirming the March 5, 2004 Order Denying Appeal of the Chairperson of the State of Hawai'i Department of Land and Natural Resources (DLNR) and Defendant–Appellee the State of Hawai'i Board of Land and Natural Resources (BLNR) [hereinafter, Order Denying Appeal]. Plaintiffs assert the following points of error: (1) the conclusion of law in the Order Denying Appeal rejecting Plaintiffs' contention that "the certified shoreline must be located at the annually recurring highest reach of the highest wash of the waves, and, if that point is mauka of the stable vegetation line, then the stable vegetation line is not the appropriate location for the certified shoreline" is in violation of the statutory definition of "shoreline" contained in HRS § 205A–1 (2001); [3] (2) the conclusion of law in the Order Denying Appeal that the proposed certified shoreline is properly located at the stable vegetation line is in violation of the statutory definition of "shoreline"; (3) the definition of "shoreline" contained in Hawai'i Administrative Rules (HAR) § 13–222–2 conflicts with the statutory definition of "shoreline" contained in HRS § 205A–1; and (4) the Order Denying Appeal "is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record."

The BLNR responds that: (1) HAR § 13–222–2 is not inconsistent with HRS § 205A–1; and (2) the DLNR was correct in setting the shoreline based on the stable vegetation line. Defendant–Appellee Carl Stephens's [hereinafter, collectively with the BLNR, Defendants] answering brief echoes the assertions of the BLNR.

Based on the following, we hold that: (1) the issue of whether the HRS and HAR conflict is moot; and (2) the circuit court erred as a matter of law in affirming the Order Denying Appeal. Accordingly, the judgment below is reversed.

## I. *BACKGROUND*

By warranty deed recorded on December 8, 1999, Stephens purchased the subject property, an ocean-front parcel in the Wainiha Subdivision on the North Shore of Kaua'i [hereinafter, Lot 2]. At the time of the purchase, Stephens did not obtain a certified shoreline survey of Lot 2, and the most recent certified shoreline for Lot 2, dated December 11, 1990, was no longer valid.

In July 2000, Stephens hired a contractor to cut the trees on Lot 2, including the large false kamani trees in the area of the shoreline. After the trees were cut, Stephens hired a landscaper to plant vegetation in the shoreline area of the lot. In or around July and August 2000, spider lilies and naupaka were planted along the "seaward property line" and the public right of way bordering Lot 2's western boundary. An irrigation line was installed to water the newly planted vegetation.

### A. *The First Survey—July 2001*

On or about July 27, 2001, Ronald J. Wagner, P.E., L.S., of Wagner Engineering Services, Inc., on behalf of Stephens, submitted to the DLNR a shoreline survey for Lot 2 based upon a field survey done on July 17, 2001. The following text appeared on the shoreline survey prepared by Wagner: "Shoreline Follows along highwater mark. The vegetation/debris line July 17, 2001 (10:30 a.m.)[.]"

---

**1.** Diamond and Bronstein are concerned citizens who have resided in the area of the subject property for over twenty-two years and eighteen years, respectively, and are familiar with the property's shoreline. No party disputes that Plaintiffs have standing to bring the instant action, presumably pursuant to Hawai'i Revised Statutes (HRS) § 205A–6 (2001) ("[A]ny person ... may commence a civil action alleging that any agency:.... (3) In exercising any duty required to be performed under this chapter, has not complied .with the provisions of this chapter.").

**2.** The Honorable George M. Masuoka presided over this matter.

**3.** HRS § 205A–1 defines "shoreline" as:

[T]he upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves.

On October 10, 2001, the state surveyor, Randall Hashimoto, conducted a site visit of Lot 2. Hashimoto recommended certification of the shoreline based upon Wagner's July 17, 2001 field survey. At the time of the site visit, Hashimoto opined that the vegetation he observed below the shoreline established by the Wagner field survey was "either planted or induced" by human activity, so he did not use such vegetation in his location of the shoreline. As recommended by the state surveyor, the shoreline was certified for Lot 2 on October 25, 2001. The certification was valid for one year pursuant to HRS § 205A-42 (2001).[4] However, Stephens's attempt to begin building within six months of the certification as required by County of Kaua'i Rules was frustrated by the inability of his architect to submit final plans in time. As such, Stephens was forced to redo the survey.

B. *The Second Survey—May 2002*

On May 15, 2002, Dennis M. Esaki, LPLS, of Esaki Surveying and Mapping, Inc., conducted a field survey of Lot 2. Hashimoto accompanied Esaki and advised him in the determination of the shoreline. In Hashimoto's opinion, according to his testimony at the contested case hearing, even if the upper wash of the waves was mauka of the vegetation line, the vegetation line would still be where he would place the shoreline:

[Plaintiffs' Attorney:] . . . [W]e are talking North Shore of Kauai—

[Hashimoto:] Yeah.

[Plaintiffs' Attorney:]—and we're talking about the surf reoccurs [sic] annually. In the same spot every year, the north swells come in and it goes over the vegetation line and sets a debris line and represents the upper wash of the waves, will you set that as the shoreline? And your answer is no, correct?

[Hashimoto:] No, I use the more stable evidence.

[Plaintiffs' Attorney:] Right, you want to use the vegetation line.

[Hashimoto:] More stable evidence, yeah.

[Plaintiffs' Attorney:] Yeah. Even if it's reoccurring annually? Meaning the upper wash of the waves beyond the vegetation line.

[Hashimoto:] Yes.

Additionally, Hashimoto testified that, in determining the shoreline, he utilized the naupaka that he had refused to utilize during the 2001 field survey. It was Hashimoto's opinion that: (1) even if the naupaka were planted or promoted by human activity, if they "withstood a complete yearly cycle or the high surf," that would establish the stable vegetation line by which Hashimoto would define the shoreline; and (2) "[t]he vegetation would have precedence over the debris line" because the vegetation line is "more stable" and the definition of "shoreline" in HAR § 13-222-2 means that "where there is a sandy beach the edge of vegetation growth is the preferred means for determining a location of a shoreline."

Based on this survey, Esaki submitted a new application to the DLNR on behalf of Stephens for the shoreline certification of Lot 2. The survey located the shoreline based upon the "vegetation line as located on May 15, 2002 (11:30 a.m.)[,]" and resulted in the shoreline moving makai by 10.82 feet on the

---

**4.** HRS § 205A-42, entitled "Determination of the shoreline" provides in full:

(a) The board of land and natural resources shall adopt rules pursuant to chapter 91 prescribing procedures for determining a shoreline and appeals of shoreline determinations that are consistent with subsection (b); provided that *no determination of a shoreline shall be valid for a period longer than twelve months,* except where the shoreline is fixed by artificial structures that have been approved by appropriate government agencies and for which engineering drawings exist to locate the interface between the shoreline and the structure.

(b) The chairperson of the board of land and natural resources shall cause a public notice to be published in the periodic bulletin published by the office of environmental quality control. All comments to the application for shoreline certification shall be submitted in writing to the state land surveyor no later than fifteen calendar days from the date of the public notice of the application. Notice of application for certification shall be identified by tax map key number, and where applicable, street address and nearest town.

(Emphasis added.)

eastern boundary and makai by 4.72 feet on the western boundary of Lot 2.

On July 23, 2002, Hashimoto conducted another site visit. Representatives of Stephens, Esaki, Diamond, and others were also present at this inspection. At the inspection, Diamond: (1) gave Hashimoto photographs that she represented as showing the upper wash of the waves of the winter surf; (2) informed Hashimoto that the owners of Lot 2 planted an "artificial" vegetation line; and (3) presented her position regarding the placement of the shoreline. Nevertheless, Hashimoto recommended for certification the shoreline submitted with Esaki's May 2002 application. On July 26, 2002, as recommended by Hashimoto, the shoreline was certified for Lot 2. The certified shoreline was valid for one year and expired on July 25, 2003. Public notice of the shoreline was published in the August 8, 2002 Environmental Notice.

On August 28, 2002, Plaintiffs filed an appeal to the BLNR asserting that the certified shoreline did not accurately reflect the upper wash of the waves as evidenced by the winter surf. Retired Judge Boyd Mossman was assigned to hear the contested case. On January 9, 2003, during the "winter wave season a few days after the highest waves of the season at high tide[,]" Judge Mossman conducted a site inspection of Lot 2. Also present were Hashimoto and representatives of the parties to the contested case hearing.

The contested case hearing commenced on March 31, 2003 and was completed on May 14, 2003. Judge Mossman issued a seventeen-page decision concluding that the shoreline was correctly determined.

On July 25, 2003, the BLNR entered its "Findings of Fact, Conclusions of Law, and Decision and Order" substantially adopting Judge Mossman's findings and conclusions and denying the appeal [hereinafter, BLNR's Order]. In relevant part, the BLNR entered the following findings of fact:

51. The location determined as the shoreline on May 15, 2002 was consistent with the adjoining properties and based on mature vegetation that predates the planting that occurred in July or August of 2000.

. . . .

53. On January 9, 2003, a site inspection of Lot 2 was held in conjunction with this contested case hearing. Present at the site inspection [were] Mr. Hashimoto, Hearing Officer Mossman, and representatives of the parties to this contested case hearing. The vegetation line used to locate the certified shoreline on Lot 2 was evidenced to be stable and well established despite the prior severe winter conditions. The stakes marking the certified shoreline were largely contained within vegetative cover.

54. Evidence of plantings of naupaka and spider lilies by persons hired by Mr. Stephens at Lot 2 in July or August 2000 was presented; however, at the time of the survey by Mr. Esaki of Lot 2 the plantings were no longer being watered or otherwise artificially maintained and had established themselves with a solid root core which had weathered two years of winter surf without retreating mauka because of salt water inundation from the highest wash of the waves.

. . . .

63. Naupaka is an ideal indicator of the upper wash of the waves because of its salt tolerance and ability to withstand occasional salt water inundation, such as may be found in storm or other unusually high wave conditions, while not surviving if constantly inundated or subjected to ripping or undermining by wave action.

. . . .

66. Randal Ismay testified as an expert in horticulture and shoreline vegetation for [Stephens]. Mr. Ismay made four site visits between February 3 and May 12, 2003.

67. It was Mr. Ismay's opinion that the certified shoreline[ ] for [Lot 2 was a] conservative demarcation[ ] of the shoreline and that the prior removal by [Stephens] of false kamani trees had allowed for resprouting of native plants.

68. [Plaintiffs'] expert witness, Dr. Charles H. Fletcher III, in his 1994 report to the Office of State Planning,

Coastal Zone Management Program, stated as follows:

> "In this report, we recommend that the shoreline definition be modified to place an increased emphasis on the use of the vegetation line as a natural monument, and a decreased emphasis on the 'upper reach of the wash of the waves.'"

. . . .

70. There was no convincing evidence of a debris line at Lot 2 though several witnesses testified that they had over the years seen wave action going up to the fence post at the public right of way and even down the pathway to the public road.

. . . .

78. The practice of the State Surveyor is to use the line of vegetation where present, and not the line of debris, as evidence of the upper wash of the waves, due to the [sic] its greater stability.

. . . .

82. The site visit was conducted during the winter wave season a few days after the highest waves of the season at high tide and evidence of waves breaching the vegetation line was minimal if at all and not convincing.

(Citations omitted.) The BLNR also entered the following pertinent conclusions of law:

11. The edge of vegetation growth is the best evidence of the shoreline in this case, as it shows the result of the natural dynamics and interplay between the waves and the line of vegetation over a period of time for stability, as against a debris line which may change from week to week or from day to day.

12. The use of the edge of vegetation growth is advantageous over the debris line in that it is practical, easily identifiable and stable.

. . . .

15. The shoreline[ ] advocated by [Plaintiffs is] not supported by the evidence.

. . . .

17. Applying the law to the facts, as a matter of law, the field survey conducted on May 15, 2002 by Mr. Esaki correctly determined the location of the shoreline on Lot 2 pursuant to the definition of "shoreline" in HRS § 205A–1 and the definition of "shoreline" and "vegetation growth" in HAR § 13–222–2.

18. The May 15, 2002 field survey was correct because, among other things: (1) the age of the vegetation around the stakes indicated that it was naturally rooted and growing; (2) there was no evidence that the vegetation was being artificially maintained; (3) the vegetation line was consistent with the vegetation along the coastline; (4) the vegetation line remained stable through severe winter conditions over an extended period of time; and (5) the stability of the vegetation was observed first hand at the site inspection on January 9, 2003 and reconfirmed on that date.

On August 25, 2003, Plaintiffs filed a notice of appeal in the circuit court. That appeal, Civil No. 03–1–0122, was dismissed by the circuit court on February 12, 2004 because Plaintiffs failed to file an opening brief as required by Civil Administrative Order 10.5.

### C. *The Third Survey—August 2003*

The previous certification having expired, on September 16, 2003, Esaki, on behalf of Stephens, submitted another shoreline certification application for Lot 2 based upon a shoreline survey which occurred on August 15, 2003. This survey located the shoreline for Lot 2 as the "shoreline as certified on July 26, 2002 and resurveyed on August 15, 2003." Hashimoto agreed with that location. A notice of the proposed shoreline certification for Lot 2 was published in the Office of Environmental Quality Control (OEQC) Bulletin on November 8, 2003.

On November 26, 2003, Plaintiffs, along with Beau Blair, filed an administrative appeal of the proposed certification of Lot 2 with the BLNR. On March 5, 2004, the Order Denying Appeal was filed, stating that the certified shoreline was properly located at the stable vegetation line. In relevant part, the Order Denying Appeal stated:

> Initially, it should be clarified that the "vegetation line" used here is not the ma-

kai edge of vegetation growth. In some areas, the proposed certified shoreline is located within the vegetated area. The State Surveyor used the "stable vegetation line" to locate the shoreline. Stable vegetation are plants that, without continued human intervention, are well-established and would not be uprooted, broken off, or unable to survive occasional wash or run-up of waves.

The fact that at one time the vegetation here was planted by human hands does not nullify the use of the stable vegetation line to determine the location of the shoreline for certification purposes. Vegetation that, even though originally induced, is able to survive through the seasons over several years without human intervention provides a good indication of the location of the shoreline.

The shoreline certification history of this property illustrates the factors considered in locating the shoreline when there is induced vegetation. In acting upon an application for shoreline certification in July, 2001, the State Surveyor, upon site inspection, noted that there was induced vegetation. Because the State Surveyor did not know how long the vegetation had been there, and consequently, could not determine whether the vegetation growth was stable, the vegetation line was not used to locate the certified shoreline at that time. Instead, in 2001 the shoreline was certified at the top of the bank.

In late 2003, the same State Surveyor, noting that the same vegetation growth had survived through at least two years, could now make a determination that the vegetation growth was stable. Thus, on this application it is appropriate to use the stable vegetation line to locate the shoreline.

*In this case there is evidence that waves sometimes, even in non-storm or tidal wave events, wash up mauka of the proposed certified shoreline. Appellants argue that such evidence is conclusive in showing that the proposed certified shore-line is erroneous. In essence, Appellants contend that the certified shoreline must be located at the annually recurring highest reach of the highest wash of the waves, and, if that point is mauka of the stable vegetation line, then the stable vegetation line is not the appropriate location for the certified shoreline. Appellants' contention is not consistent with the definition of "shoreline," and, is therefore, rejected.*

"Shoreline" for certification purposes is defined as:

> the upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves.

[HRS] § 205A–1.

In adopting this definition of "shoreline," the legislature adopted the Hawai['] i [S]upreme [C]ourt's delineation of the boundary dividing private land from public beaches in *Application of Ashford,* 50 Haw. 314, 440 P.2d 76 (1968).[5] It is reasonable and appropriate, therefore, to look to *Ashford* and its progeny for guidance on questions on how the shoreline should be located for certification purposes.

The use of the upper reaches of the wash of the waves as the boundary between private land and public beaches is based on ancient Hawaiian tradition, custom, practice and usage. Historically, "[i]t was the custom of the ancient Hawaiians to name each division of land and the boundaries of each division were known to the people living thereon or in the neighborhood." *Ashford,* 50 Haw. at 316, 440 P.2d at 77. "In ancient Hawaii, the line of growth of a certain kind of tree, herb or grass sometimes made up a boundary." *Ashford,* 50 Haw. at 316–17, 440 P.2d at 78.

If the boundaries are to be "known to the people living thereon or in the neighborhood," reason dictates that the bound-

---

5. The *Ashford* Court stated, in relevant part, "We are of the opinion that 'ma ke kai' is along the upper reaches of the wash of waves, usually evidenced by the edge of vegetation or by the line of debris left by the wash of waves[.]" 50 Haw. at 315, 440 P.2d at 77.

aries could not be so evanescent as being a point where someone happens to observe the run up of a wave. To the contrary, "[t]he *Ashford* decision was a judicial recognition of long-standing public use of Hawaii's beaches to an *easily recognizable boundary* that has ripened into a customary right." *County of Hawaii v. Sotomura*, 55 Haw. 171 [176], 181–182, 517 P.2d 57, 61 (1973) (emphasis added). Clearly identifiable markers are necessary for a boundary to be "easily recognizable" and "known to the people living thereon or in the neighborhood." Stable vegetation growth is such a clearly identifiable marker. Indeed, use of the stable vegetation line to locate the shoreline boundary is supported by the following statement made by the Hawai['] [S]upreme [C]ourt in the Sotomura case.

> Thus while the debris line may change from day to day or from season to season, the vegetation line is a more permanent monument, its growth limited by the year's highest wash of the waves.

Sotomura, 55 Haw. at 182, 517 P.2d at 62 (footnote omitted).

> In this case, the proposed certified shoreline is properly located at the stable vegetation line.

(Footnote omitted.) (First emphasis added and second in original.) (Some brackets added and some in original.)

On April 5, 2004, Plaintiffs filed their "Notice of Appeal" and "Statement of the Case" in the circuit court. Stephens filed his "Motion for Judgment on the Pleadings or for Summary Judgment" on May 18, 2004, arguing, *inter alia*, that there is no conflict between the HAR and the HRS definitions of "shoreline." On July 23, 2004, the court filed its "Order Granting in Part and Denying in Part Appellee Carl Stephens' Motion for Partial Summary Judgment." In relevant part, the court "affirmed that portion of the [BLNR's] decision" in which the "[BLNR] found that there is no conflict between the definition of 'shoreline' contained in [HAR § 13–222–2 and HRS § 205A–1]." Plaintiffs

filed a motion to reconsider on August 16, 2004, which the court denied on November 10, 2004.

On November 10, 2004, the circuit court filed its "Decision and Order Affirming Appeal," which stated, in relevant part:

> 1. The Court finds that the BLNR's findings contained in the Order Denying Appeal made after reviewing the history of this shoreline, including the prior decision in DLNR File No. KA–03–01, which was appealed to this Court in Civil No. 03–1–0122, were not clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record, and therefore the Court incorporates by reference the findings of DLNR contained and referenced therein.
>
> 2. The Court concludes that BLNR's decision was not in violation of any statutory provisions contained in HRS § 205A–1 *et seq.;* was not made upon rules and regulations in excess of its authority; was not affected by any other errors of law; was not clearly erroneous in view of the reliable, probative, and substantive evidence on the whole record; was not arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

Plaintiffs filed their "Notice of Appeal" on December 9, 2004. The circuit court's "Judgment on Appeal" was filed on January 11, 2005.[6]

## II. *STANDARDS OF REVIEW*

### A. *Mootness*

The Intermediate Court of Appeals (ICA) provided a thorough restatement of our views on the mootness doctrine in *McCabe Hamilton & Renny Co., Ltd. v. Chung*, 98 Hawai'i 107, 43 P.3d 244 (App.2002). There, the ICA noted:

> "This court may not decide moot questions or abstract propositions of law." *Life of the Land v. Burns*, 59 Haw. 244, 250, 580 P.2d 405, 409 (1978) (citation, internal

**6.** Although premature, Plaintiffs' notice is considered as filed immediately after the time the judgment becomes final for the purpose of appeal. Hawai'i Rules of Appellate Procedure, Rule 4(a)(2).

quotation marks and brackets omitted). *See also Wong v. Board of Regents, Univ. of Hawaii,* 62 Haw. 391, 395, 616 P.2d 201, 204 (1980) ("Courts will not consume time deciding abstract propositions of law or moot cases, and have no jurisdiction to do so." (Citation omitted.)). The application of the mootness doctrine is well established:

> It is well-settled that the mootness doctrine encompasses the circumstances that destroy the justiciability of a case previously suitable for determination. A case is moot where the question to be determined is abstract and does not rest on existing facts or rights. Thus, the mootness doctrine is properly invoked where "events ... have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised."

*In re Thomas,* 73 Haw. 223, 225–26, 832 P.2d 253, 254 (1992) (ellipsis in the original) (citing *Wong,* 62 Haw. at 394, 616 P.2d at 203–4). The policy underlying the mootness doctrine is also well recognized:

> This court will not proceed to a determination when its judgment would · be wholly ineffectual for want of a subject matter on which it could operate. An affirmance would ostensibly require something to be done which had already taken place. A reversal would ostensibly avoid an event which had already passed beyond recall. One would be as vain as the other. To adjudicate a cause which no longer exists is a proceeding which this court uniformly has declined to entertain.

*Brownlow v. Schwartz,* 261 U.S. 216, 217–18, 43 S.Ct. 263, 67 L.Ed. 620 (1923) (citations omitted). *See also Wong,* 62 Haw. at 394–95, 616 P.2d at 204 ("The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (Citations omitted.)).

*McCabe,* 98 Hawai'i at 116–17, 43 P.3d at 253–54. *See also In re Doe Children,* 105 Hawai'i 38, 56, 93 P.3d 1145, 1163 (2004) (reaffirming that the two conditions for justiciability on appeal are adverse interest and effective remedy).

Nevertheless, we have "repeatedly recognized an exception to the mootness doctrine in cases involving questions that affect the public interest and are 'capable of repetition yet evading review.' " *Okada Trucking Co., Ltd. v. Bd. of Water Supply,* 99 Hawai'i 191, 196, 53 P.3d 799, 804 (2002) (citations omitted). In *Okada,* we stated:

> Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question. The phrase, "capable of repetition, yet evading review," means that a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit.

*Id.* at 196–97, 53 P.3d at 804–05 (citations, quotation signals, and block quotation format omitted).

### B. *Secondary Appeal*

▇▇▇ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision.

*Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (alteration in original) (quoting *Bragg v. State Farm Mut. Auto. Ins.,* 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996)). HRS § 91–14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." *In re Hawaiian Elec. Co. Inc.*, 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (citing *Outdoor Circle v. Harold K.L. Castle Trust Estate*, 4 Haw.App. 633, 638, 675 P.2d 784, 789 (1983)). Statutory interpretation is a question of law reviewable *de novo*. *State v. Levi*, 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)).

## III. *DISCUSSION*

A. *The Issue of Whether HAR § 13–222–2 Contradicts or Conflicts With HRS § 205A–1 is Moot.*

HRS § 205A–1 defines "shoreline" as:

[T]he upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper

limit of debris left by the wash of the waves.

The old HAR § 13–222–2 (1988) defined "shoreline" as:

[T]he upper reaches of the wash of the waves, other than storm or tidal waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, *or where there is no vegetation in the immediate vicinity*, the upper limit of debris left by the wash of the waves.

(Emphasis added.) On May 12, 2006, HAR § 13–222–2 was amended, effective June 3, 2006, and now defines "shoreline" as:

[T]he upper reaches of the wash of the waves, other than storm or seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves.

The language of HAR § 13–222–2 is now virtually identical to HRS § 205A–1 and no longer states a preference for the vegetation line.[7] Thus, there is no longer a justiciable controversy with respect to Plaintiffs' assertion that the HAR and HRS conflict. As set forth above, this court will not hear an appeal absent (1) adverse interests, and (2) the availability of an effective remedy. Here, the second element is lacking because even assuming this court were to agree with Plaintiffs that HRS § 205A–1 and HAR § 13–222–2 were in conflict, there is no effective remedy available because this court will not declare an administrative rule invalid for being in conflict with a statute when that rule has already been amended so that the conflict no longer exists. Accordingly, this point of error is moot.

B. *Although the Shoreline Certification at Issue Has Expired, the Interpretation of HRS § 205A–1 Involves Questions That Affect the Public Interest and Are Capable of Repetition Yet Evading Review.*

Inasmuch as the shoreline certification at issue, which is valid only for one year

---

7. Although the BLNR claims that the deleted language never asserted a preference for the vegetation line, Hashimoto testified that, based on this language, "[t]he vegetation line would have precedence over the debris line," and he considered the debris line only if there was no vegetation line.

pursuant to HRS § 205A–42, has expired, there is also no effective remedy with respect to Plaintiffs' assertion that the BLNR incorrectly certified the shoreline of Lot 2. We cannot vacate a shoreline certification that has already expired. As such, this issue would appear to be moot. However, as set forth above, we have recognized an exception to the mootness doctrine in cases involving questions that affect the public interest and are "capable of repetition yet evading review." This is such a case because: (1) the definition of "shoreline" is certainly a matter of vast public importance; and (2) it is virtually certain that, given that the appeals process generally takes more than one year, any future shoreline certification of this or any other property will expire before the appellate process is complete, effectively frustrating appellate review. As such, both prongs of *Okada* are satisfied. 99 Hawai'i at 196–97, 53 P.3d at 804–05. Therefore, we address Plaintiffs' point of error asserting that the Order Denying Appeal reflects a misinterpretation of HRS § 205A–1 and Hawai'i case law.

### C. *Defining "Shoreline"*

Plaintiffs assert that HRS § 205A–1 and Hawai'i case law provide that *"[e]vidence of* the 'upper reaches of the wash of the waves' is *either* the debris line or the vegetation line, whichever is *further* mauka." (Emphases in original.) The BLNR counters that "[t]here is no stated requirement, either in the statute or the rules, that both lines must be considered in locating the shoreline. It is within the discretion and expertise of the DLNR to decide what is the best evidence available that accurately reflects the location of the shoreline." Both the BLNR's and Plaintiffs' contentions have merit.

#### 1. "Upper Reaches of the Wash of the Waves"

Statutory interpretation is "a question of law reviewable *de novo." State v. Levi,* 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). This court's statutory construction is guided by established rules:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our *foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.* Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Peterson v. Hawaii Elec. Light Co., Inc.,* 85 Hawai'i 322, 327–28, 944 P.2d 1265, 1270–71 (1997) (block quotation format, brackets, citations, and quotation marks omitted) (emphasis added), *superseded on other grounds by* HRS § 269–15.5 (Supp.1999).

Plaintiffs' interpretation of HRS § 205A–1 is correct insofar as the plain and obvious meaning of the statute is that the shoreline is determined by the highest—*i.e.,* the furthest mauka—reach of the waves. As the BLNR admits in its answering brief, "[t]he main thrust of this definition is that the shoreline is the *highest* point to which the waves reach on shore." (Emphasis added.) Indeed, the statute utilizes such language as "the *upper* reaches of the wash of the waves" and "at *high* tide during the season of the year in which the *highest* wash of the waves occurs." Despite this statutory mandate, however, the state surveyor, Hashimoto, testified that he uses the vegetation line to determine the shoreline even if the debris line representing the upper wash of the waves occurs mauka of the vegetation line. *See supra* Section I.B. The Order Denying Appeal also disregarded the plain language of HRS § 205A–1, and rejected the conten-

tion that the shoreline must be located at the "highest reach of the highest wash of waves":

> In this case *there is evidence that waves sometimes, even in non-storm or tidal wave events, wash up mauka of the proposed certified shoreline.* Appellants argue that such evidence is conclusive in showing that the proposed certified shoreline is erroneous. In essence, *Appellants contend that the certified shoreline must be located at the annually recurring highest reach of the highest wash of the waves, and, if that point is mauka of the stable vegetation line, then the stable vegetation line is not the appropriate location for the certified shoreline. Appellants' contention is not consistent with the definition of "shoreline," and, is therefore, rejected.*

(Emphases added.) Both this paragraph and Hashimoto's testimony are troubling insofar as they assert that the certified shoreline could be located further makai than the actual upper reaches of the wash of the waves. This clearly is contrary to the definition of "shoreline." Of course, it is possible for the certified shoreline to be further makai than the upper reaches of the wash of the waves *if* such waves were the result of storm or tidal waves. However, to the extent that the Order Denying Appeal suggests that, as a matter of law, the shoreline is not demarcated by the highest point that the waves reach on shore in non-storm or tidal conditions, the Order is erroneous.

Our decision in *County of Hawaii v. Sotomura,* 55 Haw. 176, 517 P.2d 57 (1973), supports the interpretation that the shoreline should be certified at the highest reach of the highest wash of the waves. In *Sotomura,* we stated that "[p]ublic policy, as interpreted by this court, favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible." 55 Haw. at 182, 517 P.2d at 61–62. We held that "where the wash of the waves is marked by both a debris line and a vegetation line lying *further mauka*[,] the presumption is that the upper reaches of the wash of the waves over the course of a year lies along the line marking

the edge of vegetation growth." *Id.* at 182, 517 P.2d at 62.

The legislative history of HRS § 205A–1 also supports the interpretation that the shoreline should be certified at the highest reach of the highest wash of the waves. In 1986, the legislature amended the definition of shoreline,[8] adding the following emphasized language that is currently in the statute: "the upper reaches of the wash of the waves, other than storm or tidal waves, *at high tide during the season of the year in which the highest wash of the waves occurs,* usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves." 1986 Haw. Sess. L. Act 258, § 2 at 469 (added language emphasized). Regarding this added language, House Standing Committee Report No. 550–86 states:

> [Y]our Committees have incorporated the suggested amendments to this bill by:
>
> . . . .
>
> (2) Amending the definition of shoreline, to *further clarify the manner in which the shoreline is determined to protect the public's interest*[.]

1986 Hse. Stand. Com. Rep. No. 550–86, in House Journal, at 1244 (emphasis added). This clarification, which requires the shoreline to be determined at the time when the upper reaches of the wash of the waves would be at their highest, evinces the legislature's intent to reserve as much of the shore as possible to the public. Accordingly, the "upper reaches of the wash of the waves" is the highest reach of the highest wash of the waves in non-storm or tidal conditions. Insofar as the Order Denying Appeal states otherwise, the circuit court erred as a matter of law in affirming it.

### 2. The Vegetation Line Versus the Debris Line

 The next question, then, is how to determine the upper reaches of the wash of the waves. HRS § 205A–1 provides that the upper wash of the waves is "usually evidenced by the edge of vegetation growth, or

---

8. "Shoreline" was originally defined as "the upper reaches of the wash of the waves, other than storm and tidal waves, usually evidenced by the

edge of vegetation growth, or the upper limit of debris left by the wash of the waves." 1979 Haw. Sess. L. Act 200, § 1 at 416.

the upper limit of debris left by the wash of the waves." Defendants defend the certified shoreline location in the instant case by asserting that the stable vegetation line should control because it is more permanent and easily recognizable, stating that "reason dictates that the boundaries could not be so evanescent as to be merely a point where someone happens to observe the run up of a wave." To the extent that Defendants are contending that the vegetation line should always be preferred over the debris line, we disagree.

First, the plain language of the statute does not indicate a preference for the vegetation line or the debris line. Rather, the statute merely states that *both* lines are *usually* evidence of the shoreline. Thus, it is not within the province of this court to hold that the vegetation line should trump the debris line as a matter of law. *State v. Meyer,* 61 Haw. 74, 77, 595 P.2d 288, 291 (1979) (noting that "[e]ven where the Court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used") (quoting *Queen v. San Tana,* 9 Haw. 106, 108 (1893)).

Second, the legislative history of HRS § 205A–1 supports the contention that there should not be a preference for the vegetation line. The initial statutory definition of "shoreline," as enacted in 1975, read as follows:

> "Shoreline" means the line at the seashore along the upper reaches of the wash of the waves, usually evidenced by the vegetation line *or, if there is no vegetation line, then* by debris left by the wash of the waves.

1975 Haw. Sess. L. Act 176, § 1 at 386 (emphasis added). The plain meaning of the statute, as it then read, was that if there was evidence of both a vegetation line and a debris line, the vegetation line controlled, and the debris line needed to be considered only if there was no vegetation line.[9] This preferential language, however, was deleted in 1979. 1979 Haw. Sess. L. Act 200, § 1 at

416. Had the legislature intended the vegetation growth to prevail over other evidence of the highest wash of the waves, it could have kept the language expressing preference for the vegetation. It did not, however, and we decline Defendants' invitation to so interpret the current statute.

Third, contrary to Defendants' assertions, *Sotomura* does not stand for the proposition that the shoreline should be certified along the stable vegetation line in all cases. In *Sotomura,* we stated:

> The *Ashford* decision was a judicial recognition of long-standing public use of Hawaii's beaches to an easily recognizable boundary that has ripened into a customary right. *Cf. State ex rel. Thornton v. Hay,* 254 Or. 584, 462 P.2d 671 (1969). Public policy, as interpreted by this court, favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible.
>
> The trial court correctly determined that the seaward boundary lies along "the upper reaches of the wash of waves." However the court erred in locating the boundary along the debris line, rather than along the vegetation line.
>
> We hold as a matter of law that where the wash of the waves is marked by both a debris line and a vegetation line *lying further mauka*[,] the presumption is that the upper reaches of the wash of the waves over the course of a year lies along the line marking the edge of vegetation growth. The upper reaches of the wash of the waves at high tide during one season of the year may be further mauka than the upper reaches of the wash of the waves at high tide during the other seasons. Thus while the debris line may change from day to day or from season to season, the vegetation line is a more permanent monument, its growth limited by the year's highest wash of the waves.

55 Haw. at 181–82, 517 P.2d at 61–62 (footnote omitted) (emphasis added). The language of *Sotomura* would, at first glance, appear problematic inasmuch as it supports

---

9. Indeed, this is the preferential language that was used in the old HAR § 13–222–2, which Hashimoto testified he interpreted as meaning that "where there is a sandy beach the edge of vegetation growth is the preferred means for determining the location of the shoreline."

both Plaintiffs' and Defendants' positions. Indeed, the *Sotomura* decision located the shoreline along the vegetation line because it was more mauka *and* more stable. However, a careful reading of *Sotomura* makes clear that the vegetation line was not intended always to trump the debris line. The *Sotomura* decision clearly favored the public policy of extending "as much of Hawaii's shoreline as is reasonably possible" to public ownership and use. Although the decision acknowledged that the vegetation line is a "more permanent monument," based on the legislative intent and public policy favoring shoreline access, that statement is best read as merely supporting the court's decision to use the most mauka line. Indeed, as evidenced by the facts of the present case, vegetation is not always permanent, and there is no indication that the decision in *Sotomura* contemplated owners planting and promoting salt-tolerant vegetation. *See infra* Section III.C.3. Thus, to the extent that Defendants rely on *Sotomura* as setting forth a *per se* rule establishing the primacy of the vegetation line, such reliance is misplaced. Accordingly, insofar as the BLNR's Order and Order Denying Appeal condone such a *per se* rule, they are erroneous.

### 3. "Vegetation Growth"

■ The final issue raised by Plaintiffs is the definition of the "vegetation growth" that can be evidence of the shoreline. Although HRS chapter 205A does not define "vegetation growth," HAR § 13–222–2 defines it as "any plant, tree, shrub, grass or groups, clusters, or patches of the same, *naturally rooted and growing*." (Emphasis added.) Plaintiffs argue that the planting and irrigation of salt-tolerant plants by Stephens in July or August 2000 was an "attempt to establish a false vegetation line." As such, Plaintiffs contend, "the *artificial* vegetation line relied upon by the Esaki survey and certified by the State can *not* [sic] and does *not* represent the highest wash of the waves, and therefore does *not* represent the correct shoreline pursuant to HRS [§ ] 205A–1, *et. seq.*" (Emphases in original.) In reply, Defendants assert that, notwithstanding the fact that the vegetation was originally planted and irrigated by human activity, such vegetation was "naturally rooted and growing" because it had survived more than one year without human intervention, and it could therefore be utilized in determining the location of the shoreline. We agree with Plaintiffs.

■ Generally, an administrative agency's interpretation of a rule that it is responsible for implementing is accorded great weight. *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984). However, "[t]o be granted deference, ... the agency's decision must be consistent with the legislative purpose." *Id.; see also In re Water Use Permit Applications,* 94 Hawai'i 97, 145, 9 P.3d 409, 457 (2000) ("[W]e have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation."). One of the objectives of HRS chapter 205A is to "[p]rotect beaches for public use and recreation[,]" HRS § 205A–2(b)(9) (2001), and two of its policies are to:

(A) Locate new structures inland from the shoreline setback to conserve open space, minimize interference with natural shoreline processes, and minimize loss of improvements due to erosion;

(B) Prohibit construction of private erosion-protection structures seaward of the shoreline, except when they result in improved aesthetic and engineering solutions to erosion at the sites and do not interfere with existing recreational and waterline activities[.]

HRS § 205A–2(c)(9) (2001). Additionally, as mentioned above, we have recognized that "[p]ublic policy ... favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible." *Sotomura,* 55 Haw. at 182, 517 P.2d at 61–62. The utilization of artificially planted vegetation in determining the certified shoreline encourages private land owners to plant and promote salt-tolerant vegetation to extend their land further makai, which is contrary to the objectives and policies of HRS chapter 205A as well as the public policy we set forth in *Sotomura.* Merely because artificially planted vegetation survives more than one year does not deem it "naturally rooted and growing" such that it can be utilized to determine the shoreline. We therefore reconfirm

the public policy set forth in *Sotomura* and HRS chapter 205A and reject attempts by landowners to evade this policy by artificial extensions of the vegetation lines on their properties.

### IV. *CONCLUSION*

HRS § 205A–1 defines "shoreline" as:

[T]he upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves.

In this case, despite the above statutory mandate for determining the shoreline, the Order Denying Appeal explicitly rejected the placement of the shoreline at the highest wash of the waves during high season. *See supra* Section III.C.1. The Order Denying Appeal was therefore erroneous as a matter of law, and the circuit court erred in affirming it. We therefore reverse the circuit court's January 11, 2005 final judgment.

